OPINION
On February 10, 1999, Reverend William Slimak filed a complaint in the Court of Claims of Ohio against the Ohio Department of Rehabilitation and Correction ("department"). Reverend Slimak is an ordained minister of the Eastern Orthodox Church and had worked for the department as a chaplain. Reverend Slimak averred that he was terminated from such employment based on his religion, in violation of R.C. 4112.02(A), 4112.99 and the public policy of the state of Ohio. On May 8 and 9, 2000, a trial on the issue of liability was held before the Court of Claims. On November 20, 2000, the Court of Claims rendered a decision, finding Reverend Slimak had failed to show that he was terminated on the basis of his religion. On this same date, a judgment entry was journalized granting judgment in favor of the department.
Reverend Slimak (hereinafter "appellant") has appealed to this court, assigning the following errors for our consideration:
 1. THE TRIAL COURT ERRED BY STATING THAT THE APPELLANT FAILED TO PROVE A PRIMA FACIE CASE OF RELIGIOUS DISCRIMINATION IN RELATION TO HIS DISCHARGE FROM EMPLOYMENT WITH THE APPELLEE.
 2. THE TRIAL COURT ERRED WHEN IT FAILED TO RULE THAT THE APPELLEE VIOLATED STATED AND ACCEPTED PUBLIC POLICY WHEN IT TERMINATED THE APPELLANT.
In his first assignment of error, appellant contends that the trial court's judgment on the religious discrimination claim was against the manifest weight of the evidence. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978),54 Ohio St.2d 279, syllabus. This court is guided by the presumption that the findings of the trier of fact were correct, as the trier of fact is best able to view and observe the witnesses and to use such in weighing credibility. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 79-80.
Appellant contends that the department (hereinafter "appellee") discrimi-nated against him on the basis of his religion in violation of R.C. 4112.02 which states, in pertinent part:
It shall be an unlawful discriminatory practice:
 (A) For any employer, because of the * * * religion * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.
Federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112. Little Forest Medical Ctr. of Akron v. Ohio Civ. Rights Comm. (1991), 61 Ohio St.3d 607,609-610.
In an employment discrimination case, the plaintiff bears the burden of establishing a prima facie case of discrimination. Seale v. Springfield (1996), 113 Ohio App.3d 384, 388, citing McDonnell Douglas Corp. v. Green (1972), 411 U.S. 792, 93 S.Ct. 1817. A plaintiff may establish the prima facie case either directly by presenting evidence that the employer more likely than not was motivated by discriminatory animus or indirectly by satisfying a multi-prong test which raises an inference of discriminatory intent. Seale at 388. In order to establish a prima facie case, the plaintiff must demonstrate: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement. Philbrook v. Ansonia Bd. of Educ. (1985), 757 F.3d 476, 481, affirmed and remanded for additional findings in Ansonia Bd. of Educ. v. Philbrook (1986), 479 U.S. 60, 107 S.Ct. 367.
Establishment of the prima facie case creates a presumption that the employer unlawfully discriminated against the employee. St. Mary's Honor Center v. Hicks (1993), 509 U.S. 502, 506, 113 S.Ct. 2742, 2747. Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the action. Seale at 388. The presumption created by the prima facie case shifts the burden of production to the employer; however, the ultimate burden of persuasion remains at all times with the plaintiff. St. Mary's Honor Center, 509 U.S. at 507. Once the employer produces evidence of a legitimate, nondiscriminatory reason for the adverse employment action, the trier of fact proceeds to decide the ultimate question — whether the plaintiff has proven that the employer intentionally discriminated against him or her. Id. at 511.
In attempting to satisfy the ultimate burden of persuasion, the plaintiff has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination. Reeves v. Sanderson Plumbing Products, Inc. (2000), 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, citing Texas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248,253, 101 S.Ct. 1089. The plaintiff may establish this by showing that the employer's proffered explanation is unworthy of credence. Id.,450 U.S. at 256.
As to the issue of whether the employer's explanation is pretextual, the trier of fact may still consider the evidence that established the prima facie case and the inferences properly drawn therefrom. Reeves,530 U.S. at 143. A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted reason is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. Id. at 148. In other words, a plaintiff need not always introduce additional, independent evidence of discrimination. Id. at 149.
In addition to the above, cases involving religious discrimination may involve a "reasonable accommodation" analysis. Under Title VII, an employer cannot discriminate against an employee on the basis of the employee's religious beliefs unless the employer shows that it cannot reasonably accommodate the employee's religious needs without undue hardship on the business. Philbrook, 757 F.2d at 481. The employee must present a prima facie case, and the burden then shifts to the employer to show that it cannot reasonably accommodate the employee. Id. Any reasonable accommodation by the employer is sufficient. Ansonia Bd. of Educ., 479 U.S. at 68. Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end, and the employer need not further show that each of the employee's alternative accommodations would result in undue hardship. Id.
Appellant contends he met his ultimate burden of demonstrating that he was the victim of religious discrimination. Applying the above analyses and for the reasons that follow, we determine that the judgment of the Court of Claims in favor of appellee was supported by some competent, credible evidence and, therefore, was not against the manifest weight of the evidence.
Appellant is an Eastern Orthodox priest and had worked for the state as a psychiatric chaplain for approximately twenty-five years. (Tr. 31.) He had been a chaplain at Massillon Psychiatric Center from January 1972 until January 1996. From January 1996 until August 1996, appellant had been a chaplain at Woodside Receiving Hospital ("Woodside"). Soon after starting at Woodside, appellant learned that Woodside would be closing. Id. at 38-39. In June 1996, he attended a seminar and filled out an application for a chaplain position with appellee. Id. at 40-41. Appellee was opening a new prison, Noble Correctional Institution ("NCI"), and two chaplain positions were open. Id. at 94-95, 443-444. Appellant told a representative of appellee that he was interested in the position, that he was Eastern Orthodox, and that early retirement incentive was available to him. Id. at 41-43. At the time, appellant was a member of the Health Care and Social Service Union, Service Employees International Union, AFL-CIO, District 1199 ("union").
On June 25, 1996, J.T. Fraley, the then director of human resources at NCI, wrote appellant a letter indicating that appellant had been selected for the position of chaplain at NCI. (Plaintiff's exhibit No. 11.) The letter told appellant to report to work on July 15, 1996. In addition, the letter stated:
 With reference to our recent conversation, you must determine whether to forfeit your three year buy out with PERS or to accept this position. If you do not provide notification of your decision and do not report for work as scheduled, the offer of employment will be rescinded. Accordingly, an early and written response of your decision would be appreciated. Id.
Apparently, during this time period Mr. Fraley had spoken with Woodside's human resources manager. (Tr. 197.) He told her that appellant would be receiving a chaplain position under the terms of appellant's collective bargaining agreement, and she indicated it was her understanding that appellant was going to retire. Id. at 198. Accordingly, Mr. Fraley sent appellant the above letter. Id. at 198-199.
Appellant responded to Mr. Fraley's June 25, 1996 letter on July 1, 1996. Appellant indicated that he intended to arrive on July 15, 1996 to attend the pre-service training class. (Plaintiff's exhibit No. 12.) He also stated:
 As to the early retirement incentive and PERS, I intend to follow the Ohio Revised Code and all State Regulations, and trust other state agencies will do the same. Id.
On July 5, 1996, appellant was sent a letter from Mr. Fraley informing him that his reporting date to NCI had been delayed until an inmate population of one thousand had been reached. (Defendant's exhibit No. 3.) Eric Dahlberg, appellee's then "Southern Regional Director," decided that a second chaplain would not be hired until the inmate population reached one thousand. (Tr. 219.) Mr. Fraley could not establish a specific date for appellant's transfer. Id. However, the letter further stated:
 At the time of reaching the one thousand inmate population, I will notify you and if your [sic] are an active participant in the 1199 bargaining unit, a transfer action from mental health to this agency will be initiated for you. [Defendant's exhibit No. 3.]
During this time period, appellant had been in contact with the Public Employees Retirement System of Ohio ("PERS") regarding his retirement. (Tr. 55-56.) Appellant informed PERS that he wanted to continue to work for the state, and PERS sent him a form to fill out and give to appellee. Id. at 56. On July 17, 1996, PERS sent appellant a letter which indicated that his employer had agreed to purchase three years of service credit under its retirement incentive plan. (Plaintiff's exhibit No. 15.) Such letter also indicated that the service credit was granted on June 30, 1996 and that if he had not already retired, appellant's failure to retire within ninety days from the date of the service credit would result in the forfeiture of such service credit. Id.
Appellant retired from the Department of Mental Health on August 31, 1996. (Tr. 108.) Appellant did not inform Mr. Fraley that he had retired. Id. at 56. Appellant did not tell anyone at the Department of Mental Health to process a transfer to appellee because he felt it was not his responsibility. Id. at 109. Apparently, appellant had been off on sick leave from Woodside from July 15, 1996 until August 29, 1996. (Plaintiff's exhibit No. 8.) Prior to September 1, 1996, appellant was told to report to NCI on September 3, 1996, the Tuesday following Labor Day. (Tr. at 61.) Appellant reported to work for appellee on September 3, 1996.
On his first day of work, appellant met Reverend Victor Marshall, who was the other chaplain at NCI. Id. at 62, 281. Appellant testified that he was surprised to see Reverend Marshall because he thought he was the first chaplain to go on staff. Id. at 63. Appellant testified that his surprise did not cause any problems, and he found Reverend Marshall very nice and looked forward to working with him. Id. Reverend Marshall was hired first because he had priority over appellant under the collective bargaining agreement, having worked for appellee at another facility. Id. at 444-447.
That week, appellant met with Dr. David Schwarz, appellee's administrator of religious services for the south region. Id. at 69-70, 325. They had a conversation about the Eastern Orthodox religion. Id. at 69-70. Appellant testified that he asked Dr. Schwarz about an Eastern Orthodox worship service, and Dr. Schwarz told him it was forbidden. Id. at 71. Appellant testified that Dr. Schwarz told him he could function as a Roman Catholic deacon if it was okay with the Roman Catholic chaplain.[1] Id. at 71-72. Appellant testified that he listened to what Dr. Schwarz had to say on the matter and did not protest. Id. at 72. Appellant testified that Dr. Schwarz told him he could not practice the Eastern Orthodox religion at NCI. Id. at 87.
When asked if religion played a factor in his termination from NCI, appellant replied, "[y]es, * * * I was told I can't have services. I was told I wasn't wanted. * * * I didn't even raise the issue of services. And that's what I'm led to believe. That's the conclusion I come to." Id. at 88. Appellant indicated that it was his perception that appellee created an atmosphere that he could not work at NCI because of his faith. Id. at 112. The bases for such perception included that he was told he had to work as a Roman Catholic priest, that he could not perform Eastern Orthodox services, that there could not be a cross in the chapel and that he could not say the name "Jesus Christ" at worship services. Id. at 116-117, 122-123.
Appellant testified that he met NCI's then warden, Thomas Haskins, briefly prior to starting at NCI. Id. at 63. Appellant told the warden that he was Eastern Orthodox and that the Eastern Orthodox church was the church "that the Roman Catholic church broke away from." Id. at 65. Appellant testified that Warden Haskins replied that that was debatable. Id. Appellant felt this was hostile. Id. at 66. Mr. Haskins, who was baptized Roman Catholic, testified that when appellant told him that the Eastern Orthodox church was the first church, he replied that that was debatable. Id. at 251-252. Mr. Haskins stated that there was no further discussion on the matter. Id. at 251.
Appellant testified that a guard had told him that the name Jesus Christ could not be used. Id. at 123. However, appellant stated that Dr. Schwarz and Reverend Marshall had not directed such and that he did not really know if this was the policy. Id. Reverend Marshall testified that he never told appellant that he could not say the name Jesus Christ during worship services and that he (Reverend Marshall) himself used the name Jesus Christ in performing worship services. Id. at 295. Appellant testified that on the day he was fired, he was escorted out of NCI by an assistant to Mr. Fraley. Id. at 14, 127. The assistant first told appellant that he could not work for the state for six months after retiring. Id. at 14. Appellant also testified that "it seems to me [the assistant] said, `You're Eastern Orthodox, you're not wanted here.'" Id. at 15. David Lynch, a labor relations officer at NCI, escorted appellant out of the building the day he was terminated. Id. at 421-422. Mr. Lynch testified that he told appellant the reason he was terminated and that he did not tell appellant that he was terminated because he was Eastern Orthodox. Id. at 420-421.
Appellant was terminated from NCI on September 6, 1996, the first week he had worked there. Appellant was replaced by Reverend Gary D. Eno, who was ordained in the Conservative Congregation of Christian Conference. Id. at 269. Reverend Eno did not begin his employment at NCI until September 1997. Id.
In essence, appellee asserts it terminated appellant because appellant had retired, not transferred, and therefore had no right under the collective bargaining agreement to the chaplain position. Mr. Lynch testified that appellee had many employees transferring to NCI, and he could not find appellant's paperwork in order to pay appellant. Id. at 415. Mr. Lynch stated that in order to move an employee from one agency to another, the transferring agency must initiate a personnel action, and NCI did not have the proper document. Id. at 416. Mr. Lynch testified that he had several discussions with appellant about this transfer. Id. at 416, 428-429. Mr. Lynch called the Department of Mental Health and found out that appellant had retired. Id. at 418. Appellant never informed Mr. Lynch that he had retired. Id. at 428.
Mr. Lynch informed Warden Haskins and Mr. Fraley, and they discussed the situation. Id. at 418-419. Mr. Lynch explained that appellant was given the chaplain position by "bid" because he was believed to be in the union. Id. at 419. However, if an employee retires, the employee is no longer in the bargaining unit and cannot receive the job through bid. Id. Therefore, the decision was made to terminate appellant. Id. at 420. Mr. Lynch testified that in making the decision to terminate appellant, there was no discussion about appellant's faith and religious practices and that there was no discussion that appellant should be removed because of his faith. Id.
Mr. Fraley testified that appellant would have had to have asked the institution where he was working to initiate a transfer from the Department of Mental Health to appellee. Id. at 166-167, 179. Mr. Fraley wrote to Woodside on July 5, 1996, informing it that appellant's transfer to NCI could not occur until the facility housed one thousand inmates. (Plaintiff's exhibit No. 13.) Mr. Fraley testified that at some point he was told by Woodside that appellant was expected to retire. Id. at 176. Mr. Fraley called appellant about this, and appellant's response was "evasive." Id. As indicated above, Mr. Fraley wrote appellant twice in the summer of 1996 informing appellant that if he retired and/or was not a member of the union, he would forfeit his right to have the job by transfer. Id. at 198; plaintiff's exhibit Nos. 3, 11. Mr. Fraley testified that appellant could have transferred to NCI by initiating the transfer prior to August 31, 1996, the day Woodside closed, and by starting at NCI on September 3, 1996. Id. at 486-487.
Mr. Fraley testified that appellant started at NCI on September 3, 1996, prior to the facility having one thousand inmates, because it was expected that by the time appellant completed a three-week training program, there would be one thousand inmates. (Tr. 199.)[2] Mr. Fraley met with appellant on the day he started in order to fill out personnel forms, and Mr. Fraley testified that appellant informed him that he was transferring and not retiring. Id. at 204. Mr. Fraley called PERS and was informed that appellant had accepted an early retirement incentive. Id. at 196. Mr. Fraley went to Mr. Haskins and told him of the discrepancies in the information they had on appellant — that he had transferred to NCI, although they had nothing officially showing that, and that he had retired on August 31, 1996. Id. at 201. Mr. Fraley testified that appellant was terminated "* * * for taking a job under false pretenses, because, had he been transferred, he would have had union rights which allowed the transfer. If he had retired, he would not have been an employee, and would not have automatically * * * been transferred into the position." Id. at 191.
Mr. Haskins testified that Mr. Fraley and Mr. Lynch informed him of the problem with appellant. Id. at 213, 240. They told him that it appeared to them that at the time appellant had applied for the position, he was a member of the union and, therefore, this precluded anyone else from receiving the position because appellant had seniority. Id. at 214-215. Mr. Haskins testified that Mr. Fraley and Mr. Lynch were waiting on confirmation from the Department of Mental Health as to whether appellant had retired prior to becoming an employee of appellee. Id. Mr. Haskins was informed that appellant had retired from the Department of Mental Health, which negated his contract rights to the position, and appellee had made an incorrect appointment based on misinformation at the time. Id. at 240-241. Under the circumstances, appellant was not entitled to the position, and the next most senior person in the union would become eligible. Id. at 242. Mr. Haskins explained:
 Well, it's a matter of following proper procedure. When you have a posting, that posting, the file is a matter of public record. And any of the people who were in the applicant file at the time that are considered to be meeting the minimum qualifications have a right to review the file and be given an explanation as to why they were not selected.
 And in the case of a contractual appointment, which is what we thought Mr. Slimak's was initially, they don't have any right to appeal, because we're only honoring what a bargaining unit contract says we're supposed to do. And if that isn't the case, we have the obligation to demonstrate to the other applicants why the person selected was demonstrably superior to them.
 So if we were to select someone outside of the terms and conditions of the contract, they would have a right to appeal the selection and challenge the fact that they should have been given a position instead of the person that was. Id. at 244-245.
Mr. Haskins further testified that someone cannot retire from one agency and begin working for another the next day without having a break in service, and the employee must be retired from the agency for six months prior to seeking reemployment. Id. at 246. In addition, once the employee retires, he or she no longer has bargaining unit rights. Id. This, Mr. Haskins stated, was why appellant was terminated. Id. at 247. Mr. Haskins testified that no one said they did not want appellant to work there because of his religious background, and Mr. Haskins was not aware of any problems relating to appellant's religious background. Id. at 241, 247.
Appellant testified that he applied for an early retirement incentive; however, it was not his intention to retire, and he wanted to continue being employed. Id. at 43-44. As indicated above, appellant told PERS that he was retiring and that he wanted to continue to work. Id. at 55-56. Appellant testified that he called PERS to see if it was true that you could not work for the state for six months after leaving employment, and PERS told him that this was not true. Id. at 496-497. Appellant testified that PERS told him the proper procedure to follow in such a situation. Id. at 56.
PERS sent appellant a form to give to appellee upon his arrival at NCI. Id. Such form is entitled "NOTICE OF RE-EMPLOYMENT OF A PERS RETIRANT," and appellant stated that he submitted such form to Mr. Fraley. Id. at 59; plaintiff's exhibit No. 1, 10. Mr. Fraley did not recall seeing this form and testified that appellant may have given it to his office or handed it to him. (Tr. 200.) The form was signed by Jill Leister, a personnel officer in Mr. Fraley's office, on September 4, 1996 and was in appellant's file. Id. at 200-201; plaintiff's exhibit No. 1. Appellant signed the form on July 15, 1996 and indicated on such that he was an age and service retirant and was choosing to receive compensation, have his retirement allowance suspended during re-employment and make contributions toward a formula benefit. (Plaintiff's exhibit No. 1.)
Appellant did not tell anyone at NCI that he had retired. (Tr. 56.) Appellant testified that as to his employment with appellee, no one told him he was in possible violation of the collective bargaining agreement. Id. at 45. Appellant believed that on the day he left the Department of Mental Health he was still an active employee. Id. at 89. He did not tell anyone at the Department of Mental Health to send transfer papers to appellee because he felt this was not his responsibility. Id. at 109, 137-138.
Article 28 of the collective bargaining agreement addresses seniority and states that continuous service is interrupted only by separation because of resignation, discharge, failure to return from a leave of absence, and failure to respond to a recall from layoff. (Plaintiff's exhibit No. 4 at 60.) Article 30 addresses vacancies and states, in essence, that a vacancy shall be awarded to the qualified applicant with the most state seniority. Id. at 67. The collective bargaining agreement does not address the situation here — where a state employee retires from one agency and is re-employed by another. The collective bargaining agreement only applies to employees of the union. Id. at 1-2.
On September 9, 1996, appellant filed a grievance with the union, stating the grievance as, "Break in Service, Transfer, New Hire, (SR-6 from PERS presented immediately upon arrival). SR-6 on File signed with PERS. Delay in Hiring caused delay in transfer Papers until Woodside closed." (Tr. 77; defendant's exhibit No. 5.) When asked what happened with the grievance, appellant stated, "[t]here was some sort of shutdown of — or job action, as it was called, and that led to a break-off of any negotiations or contact between the union and management." (Tr. 77.)
The above evidence shows that appellee terminated appellant because it believed appellant did not properly receive the appointment. Appellee believed appellant was transferring from the Department of Mental Health and had automatically received the appointment pursuant to the terms of the collective bargaining agreement. Upon learning that appellant had retired on August 31, 1996, appellee terminated appellant because it believed appellant was no longer a member of the union and, therefore, could not have received the position by "bid."
Appellant contends appellee's explanation for its action is merely pretext. As discussed above, appellee's agents testified that appellant's religious background had nothing to do with their decision to terminate appellant. However, appellant points to certain evidence which he contends shows discriminatory behavior on the part of appellee. For example, appellant asserts he was not permitted to perform Eastern Orthodox services at NCI and that appellee's policy favored the Protestant and Roman Catholic religions.
Appellant points to a document from appellee entitled "AUDIT REQUIREMENTS AND ACTIVITIES/CONTINUATION." (Plaintiff's exhibit No. 26.) Such document states, in pertinent part:
. 02 WORSHIP SERVICES
 02.01 A weekly worship service should be offered for each major faith group (Protestant Christian, Catholic Christian, Muslim, etc.)
* * *
 02.02 The worship services are offered at the appropriate time as prescribed for each major faith group.
* * *
 .01 Jumma (sic) Prayer Services is conducted between 12:00 Noon and 3:00 P.M. on Friday afternoons.
Review time of Jumma (sic)
 .02 Catholic Mass. is offered on Saturday or Sunday during the week.
Review time of Mass.
 02.03 The worship services are directly conducted by the chaplain or a community person on contract to the institution who has the appropriate religious credentials to perform the services. * * *
* * *
 .01 Protestant Services will be conducted by an ordained or licensed Protestant minister, who is a staff chaplain or community minister on contract. * * *
* * *
 .02 The Catholic Mass. is conducted by a chaplain who is an active Roman Catholic priest or a community priest who is on contract. * * *
* * *
 .03 The Jumma (sic) Prayer Service is conducted by a community Iman (sic) who is on contract to the institution. * * *
* * *
 .04 The Jewish worship services are led by a Rabbi who is on contract to the institution. * * *
* * *
 .05 Other appropriate religious services, when needed, are led by a properly credentialed community contract person, of the faith group involved. Id.
Appellant contends the above document allows only Protestant and Roman Catholic ministers to be chaplains. However, Dr. Schwarz testified that in 1996, the audit instrument was used only as a training device for new chaplains. Id. at 327. The audit instrument was written to reflect the reality at the time (there were no Jewish or Muslim chaplains then), and it did not reflect the only possibilities. Id. at 354.
When an inmate is processed into a facility, the inmate may fill out a religious preference form, indicating which religion he or she practices. Id. at 230, 284, 331. As to the "major faith groups" in the above audit, Dr. Schwarz testified that such represented the prison population at the time. Id. at 330. Dr. Schwarz stated that weekly worship services are based on inmate need and that if five or more inmates desired a particular worship service, appellee would contract with the appropriate person to perform such service. Id. at 384, 388. Appellee looked for the needs of inmates prior to offering or soliciting a specific religious service. Id. at 343. Dr. Schwarz testified that Eastern Orthodox services were not offered at NCI because to his knowledge, no inmates had requested such. Id. at 334-336.
Reverend Marshall, a Seventh Day Adventist, testified that appellant was not permitted to perform Eastern Orthodox services for the same reason he could not perform Seventh Day Adventist services — there were no inmates requesting such at NCI. Id. at 286, 288-289. Reverend Marshall testified that the state had made provisions primarily for the larger Western religions to have either a full-time or part-time contract representative to perform specific worship services. Id. at 291-292. He testified that there is no Eastern Orthodox priest on contract because there are no Eastern Orthodox inmates, and there is no favoritism toward any particular religious group. Id. at 292. He stated that NCI had a contract Imam and Roman Catholic priest to perform the weekly Juma prayer service and mass, respectively. Id. Dr. Schwarz testified that in the late 1980s, appellee had a significant Eastern Orthodox inmate population at Chillicothe Correctional Institution who made their wishes for weekly Eastern Orthodox services known, and appellee contracted with an Eastern Orthodox priest to provide such weekly services. Id. at 335.
Dr. Schwarz testified as to the job duties of appellee's chaplains. The chaplain is the administrator of all formal religious activities in the institution. Id. at 381. The chaplain oversees worship services and is involved in scheduling such services, recruiting people to perform such services and evaluating the institution's needs. Id. at 381-383. If the chaplain had the credentials to perform a certain worship service offered, he or she would perform such service. Id. at 340, 383. The chaplain engages in crisis counseling such as when an inmate's family member dies. Id. at 381. Reverend Marshall testified that other than worship services, the chaplains conduct therapeutic groups, not necessarily of any faith group, counsel the inmates, and help facilitate the religious activities of all other faith groups. Id. at 290-291. Reverend Eno testified that he provides Sunday worship services, helps set up for the Catholic worship service, conducts bible studies and a domestic violence prevention program, teaches a course on forgiveness and provides pastoral counseling. Id. at 272-274.
Dr. Schwarz testified that appellant was not hired to be NCI's Eastern Orthodox chaplain and that no chaplain is to service only one faith group. Id. at 339. Dr. Schwarz testified that appellee has "generic" chaplains who are responsible for all religious programs at the institutions. Id. at 340. Dr. Schwarz stated that appellant could have been this generic chaplain. Id. at 389-390. Indeed, even appellant himself testified that it was always his intention to give a "fair share" to each inmate, regardless of their faith. Id. at 155-156.
Dr. Schwarz told appellant that it was his wish that appellant would be part of a weekly worship service. Id. at 341. Dr. Schwarz wanted appellant to participate in a weekly worship service in order to show respect for other faith groups, but he did not want appellant to violate any of appellant's own tenets. Id. at 392-393. Dr. Schwarz stated that faith groups have different requirements for their ordained clergy as to what they can and cannot participate in, and Dr. Schwarz asked appellant to go to the Eastern Orthodox authority to see which service(s) appellant could participate in. Id. at 344. If appellant was given permission by his faith's authority, then appellant could go to the Roman Catholic authority for permission. Id. at 345. Dr. Schwarz testified that if appellant's superior said he could not participate, then such decision would have been respected. Id. at 398. Both Dr. Schwarz and Reverend Marshall testified that they had no role in appellant's removal. Id. at 296, 398.
Appellant contends that there was no reason appellee could not reasonably accommodate his religion. However, this is not the issue. There was no religious conflict with an employment requirement. There was no requirement that appellant perform a particular worship service or any worship service at all. R.C. 4112.02 does not mandate that appellant be permitted to perform Eastern Orthodox services or practice his faith as part of his employment with appellee. The evidence was that inmate need was the factor in determining which weekly services would be provided. There simply was no need for Eastern Orthodox worship services at NCI. As Dr. Schwarz testified, the chaplain positions were generic in nature, and appellant was not to be the Eastern Orthodox chaplain. If there was a reasonable accommodation to make, it was to not require that appellant perform a worship service that was contrary to appellant's beliefs and/or practices. As indicated above, appellant's wishes in this regard would have been respected.
Appellant had the ultimate burden of showing that he was terminated because he was Eastern Orthodox. Appellant failed to meet this burden. Appellant's contentions consist largely of either statements he claims were made to him about his faith that were denied by other witnesses or his "perception." Such evidence is subject to credibility determinations best made by the trier of fact, not this court. Appellant's perceptions, without more, are insufficient to make a discrimination finding. Appellant failed to show that appellee more likely than not was motivated by discriminatory animus. Even if appellant initially raised an inference of discriminatory intent, he failed to meet his ultimate burden of showing intentional discrimination.
Appellee set forth a legitimate, nondiscriminatory basis for terminating appellant. Appellant failed to show that such was pretext. In concluding such, we are not passing judgment on how appellant went about his retirement with the Department of Mental Health and his subsequent employment with appellee. We are merely concluding that there was sufficient evidence showing appellee had a nondiscriminatory reason for terminating appellee. There was conflicting testimony about the proper procedure to follow when a state employee retires and then seeks re-employment within the state. However, there were no "experts" on this issue, and none was necessarily required. There was sufficient competent, credible evidence that appellee legitimately believed appellant was not entitled to the chaplain position under the collective bargaining agreement and state law and that this was the reason appellant was terminated.
In summary, there was some competent, credible evidence supporting the trial court's decision. Therefore, the judgment in favor of appellee was not against the manifest weight of the evidence. Accordingly, appellant's first assignment of error is overruled.
In his second assignment of error, appellant contends the trial court erred in failing to rule that appellee violated public policy in terminating appellant based on his religion. Having found the trial court did not err in granting judgment in favor of appellee on appellant's religious discrimination claim, we find the trial court did not err in failing to find appellee violated public policy on these same grounds. Accordingly, appellant's second assignment of error is overruled.
Having overruled each of appellant's assignments of error, the judgment of the Court of Claims of Ohio is affirmed.
______________________________________ TYACK, J.
BOWMAN and PETREE, JJ., concur.
[1] NCI did not employ a full-time chaplain of the Roman Catholic faith; rather, it contracted out with a Roman Catholic priest to perform weekly worship services.
[2] There was testimony that NCI did not reach one thousand inmates until November 1996 or late January 1997. (Tr. 171, 219.)